This time, we'll hear the Coalition for Competitive Electricity versus Zeibelman. Thank you. Good morning. Good morning. Thank you, and may it please the Court. If this is acceptable to the Court, what I propose to do is take two minutes at the outset and summarize the key points on the core preemption issue. Then I propose to turn to the cause of action issue, the Armstrong question, and then come back for a more detailed discussion of the merits. Go ahead. On the merits, four features taken together make clear that the New York ZEC program is wholesale rate-making indistinguishable from the Maryland program preempted in Hughes by the Supreme Court. First, the only nuclear plants eligible for the subsidy are ones that cannot operate profitably under the rates that FERC has deemed to be just and reasonable. Same as Hughes. Second, New York guarantees that the favored plants will receive not only the just and reasonable auction rates, but the ZEC subsidy on top of those rates for every unit of electricity they sell at wholesale. Same as Hughes. Third, the ZEC subsidy is tethered to the movement of the wholesale rates in the auctions. Under Hughes, it has to be tethered to the wholesale market participation. I will get to that. That's the fourth point. It certainly is tethered to the rates, but it's tethered to an estimate of the rates into the future. But I'm not sure it's contingent on the nuclear plants' participation. That's the fourth point, Your Honor. While it is true that it's a nominal matter, it's a formal matter, New York did not expressly condition the receipt of the subsidy on participation in the wholesale auction markets. They didn't need to because all of the output of these plants is necessarily sold into the wholesale markets. There seems to be a fact question on that, that some of their power is sold to local electric companies, retailers, and bypasses the auction. First, this is before the court on a motion to dismiss, and we've made allegations in the complaint that all of the electricity that these plants generate is sold at wholesale. We think that we can prove it. It is true. I suppose it is, but suppose they could also sell it some other way. But I think that if, in fact, this output is all sold at wholesale, and the vast majority through the auctions, maybe some through contracts, but those are wholesale sales, too, and they get the subsidy for those, too. That's not bypassing the wholesale market. That's in the wholesale market. And they get, in whatever percentage they may sell the contract. They may do a thing. That doesn't mean they're tethered to it. I mean, there are people who buy the same brand of beer for 20 years, but they're not tethered to it. They can buy another brand of beer. Right, but here, as a practical matter, all they can do is sell at wholesale. So New York knows that that is where this electricity is going. So New York knows that for every unit sold, these plants are going to get the ZEC subsidy over and above the wholesale auction rate. And I do think that that's the way the Supreme Court has indicated that this preemption analysis needs to go. And I would point the Court, in particular, to the Wass case, which says preemption depends on what state law actually does, not how the state describes it. And what it actually does here is exactly what Hughes said that a state cannot do, exactly what Hughes said is preempted, which is that it disregards the interstate wholesale rate FERC has deemed just and reasonable, and instead guarantees a certain rate for sales regardless of the clearing price. But the ZEC doesn't do that. What it does is guarantee a credit for production or generation. And whether they sell it or not or who they sell it to is irrelevant to that program. You're saying as a practical reality that's what happens because nuclear generators must sell their output into the wholesale market. But that doesn't mean that the law requires it, and that's the only thing that Hughes seems to prohibit. No, I disagree with that, Your Honor. I think that in terms of what Hughes prohibits, the only thing that Hughes prohibits, what Hughes prohibits is ensuring that wholesale providers obtain, receive a rate that is distinct from, different from, in disregard of the wholesale rate that the FERC auction process has set. And that is what happens here. These plants, as again, we've alleged this in the complaint, and we will be able to establish it, they sell all of their output at wholesale. They would do that regardless of the program, though, because of the nature of nuclear generation. Correct. They have to keep producing, so they have to sell their output into the market, in various markets, but they're not required to participate in the wholesale market. I guess that's why I'm pushing back, Your Honor. They sell it all into wholesale, all of it. But I think that's a factual issue that seems to be in dispute. There was one suggestion that LIPA owns or invests in one of these ZEKE generator plants, right, and therefore they buy directly from them. So I think this is going back to Judge Jacobs' point, is that there may be a factual issue as it's been raised that, in fact, they don't sell all of their output on the wholesale market. Well, we're here on a motion to dismiss . . . Correct. . . . in which our factual allegations need to be accepted as true. We have alleged that they sell all of their output at wholesale. Even if there is something to this LIPA point, I would suggest, Your Honor, that that is really the flea on the tail of the dog. It would be such a small amount that it really does not call into question the legitimacy of this program for preemption purposes. And I think it's a little bit hard until we've actually had factual investigation to know exactly how to deal with that LIPA question. But what I do think is clear is that when we're here on a motion to dismiss and when it's clear, we think that, under any understanding, the vast majority of this power gets sold directly into the wholesale system. Selling it through contracts . . . But why shouldn't we recuse to have what, granted, would be a very formal element? There's no requirement, and you're not alleging that there's a requirement, but even if, economically and practically speaking, every unit of electricity must go into the wholesale auction, why should we recuse not to impose a formal requirement? Otherwise, it seems like any subsidy would be preempted. So, I don't . . . I think the reason not to, Your Honor, is because it disregards, I think, the thrust of Hughes itself. There's that one sentence that my friends on the other side point to, and I assume Your Honor is referring to. But the beginning of that paragraph says, we hold that the Maryland program is preempted because it's providing a rate that's in disregard of the FERC-approved auction rate. And remember, the operative statutory provision here is one that says that it covers not just the rates that the wholesale supplier charges, but it's all charges that the wholesale supplier receives, and it's not just for the sale, but it's in connection with the sale. That's the governing statutory text. It's clearly broader. And I do think that the key operative language in Hughes is really a page or so earlier where, and this is at page 1297 of 136 Supreme Court, and I think I quoted it earlier, but it said that the problem is that Maryland guarantees a certain rate for sales into the auction, regardless of the clearing price. And that is what is happening here. It's also the case that in Hughes, and in another case that the Supreme Court decided the same term, EPSA, the Court said that the test is that there's no room under this regulatory scheme, either for state laws that directly regulate wholesale rates, or state actions that indirectly have the same effect. Indirectly have the same effect. The Court said that in EPSA. It quoted that language in Hughes. It quoted it in conjunction, really, with the point I've just appointed the Court to, and that I do think is consistent with what the Supreme Court has said in the Wass case, the National Meat case, and others about the way preemption analysis goes. You look at what the law actually does. The Supreme Court also makes plain that there's a very substantial role for the states, and that they can provide subsidies to favored producers for any reason that's remotely rational, and a subsidy has the same effect. If you get a subsidy that's based upon the amount of electricity you sell, then that's boosting the price. The Supreme Court, I think, gave specific direction on that point as well, Your Honor, where it said states may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority over interstate wholesale rates, and I certainly agree with Your Honor, and I think the Supreme Court made clear, that there are things states can do, and they may have economic effects on the auction process. And on the price that people get for their electricity. You make a compelling argument that what you're complaining about affects the wholesale price, but subsidies are allowed, and it seems to me that affects the wholesale price as well. They seem to be tolerated. I think it depends, Your Honor. Certain things clearly the state can do. They can have a cap-and-trade system. In fact, New York is participating in a regional cap-and-trade system now. That doesn't interfere with the auction mechanism in the way that this does. New York can impose a carbon tax. Maybe have an incidental effect, doesn't interfere. New York could build its own plants if it thinks that there's not enough zero-emission credit. FERC allows that. Would have an indirect effect, doesn't interfere. New York could give a tax abatement. Again, indirect effect, doesn't interfere. All kinds of things a state can do, but what the state can't do is adopt a means, as the Supreme Court said in Hughes, that interferes with the auction, with the price-setting mechanism for wholesale sales. And I don't think there's any doubt here because, and if I could go back to your question, Judge Livingston, about the limit. I think I've tried in the four points I laid out at the opening to suggest that there's the limiting principle, that the court can adopt to avoid the risk that Your Honor's question implies. You're only eligible for this if you cannot make a profit based on the wholesale rates. If you look at page A255 of the appendix, you'll see right there in black and white in the PSC order, you're only eligible if you can't make a profit based on the capacity, energy, and ancillary markets. Well, those are the three wholesale markets. Eligibility tells you what this is about. Then, as I said, you get this subsidy for every unit you sell over and above the just and reasonable rate that FERC auctions give you. And then, so that's a limiting principle, too.  Third, you have the tether that the subsidy price moves in conjunction with the movement of the wholesale auction forecasts, so that whether the wholesale market is actually going up or going down, what these three plants are going to receive is the compensation level that New York wants them to receive for each unit of output they sell. And it's accurate except for the word actually, because it's estimated. It's not the actual. Right, but it's true, Your Honor, but the estimates are based on futures forecasts, which are, you know, it's an effort to approximate as close. Well, sure, but... If you invest in forecasts, you can lose your shirt. Yes, but that doesn't mean, that doesn't change the fact that even if they don't get to the nickel, the amount that New York wants them to get, they're going to get within a range of what New York wants them to get, and that range is going to be substantially above what the wholesale auction rates are, and that's the problem. And whether it's down to the nickel or not, it's still in disregard of the rates that the auction set, and that's the problem that Hughes identified for preemption purposes. And so, you know, you've got that, and then you've got the fourth consideration, which is that we're talking about here nuclear plants that always operate at full capacity. You can't store their power. It all goes into the wholesale grid, the New York ISO grid, and so when you have those four conditions present, it seems to me, you've really got something that is, in practice, indistinguishable from the Maryland program invalidated in Hughes. That's the problem. In practice, the point is whether or not the law itself requires any of these things, and I think this goes back to the question of if the law doesn't require it, that it may have this practical effect is not something that ought to be preempted. Well, I guess I would push back on that, because if that's the case, Your Honor, then Hughes was a ticket good for one ride only. That, you know, Maryland did this thing, and it did have this express condition. States can now figure out clever ways to deliver exactly the same subsidies in exactly the same per-megawatt-hour form, tethered in exactly the same way to price movements, only for plants that can't operate profitably under the rates that FERC thinks should govern, but if they just leave out an express condition but ensure in other ways that that subsidy is going to flow for all of the energy sold in the wholesale market, they can do it, and I really don't think that that is a fair reading of Hughes. Now, I understand that there's a question of limits here. Can I interrupt you? Isn't it true that the only way that the ZEIC program affects the wholesale rate, the actual wholesale rate, is because, as you allege, it allows for the dumping of cheap energy into the grid, thereby in theory lowering what the market clearing price will ultimately be, because there's too much cheap energy. Isn't that really the only way it impacts the wholesale market rate? No. It harms us that way. That's how it harms us. That's how it inflicts the hundreds of millions of dollars of harm on us. It affects the wholesale rate that Exelon receives. They receive. That's the key statutory language. What does the supplier receive, and not just for, but in connection with? It's not based on them participating in the market. It's based on what they produce, right? So they may not sell any wholesale. I mean, they may not participate at all in the wholesale market, but will still get the ZEIC credit, right? Except that that can't happen in the real world, Your Honor. All of what they sell goes into the wholesale market. There's no other option than to do that. And that's what we've alleged in our complaint. We're ready to prove it. It's true. And New York knew that when it adopted this regulation. And so this regulation functions in a manner that's just identical to the way that the Maryland program functioned. And that was its point. Its point is to funnel a per megawatt hour subsidy to Exelon for every unit that they sell into the wholesale market. That's what this does. And I do think that with respect to what Hughes is all about, yes, Hughes recognizes a need for limits. But, boy, if this is not preempted under Hughes, then Hughes is really confined to its facts, and I don't think that's a fair reading. You've reserved four minutes for rebuttal. Thank you. You're then, sir. May it please the Court, Scott Strauss for the commission. Good morning. The Federal Power Act treats energy generation and its subsequent sale as distinct activities and divides regulatory control between the states who have control over generation and the federal government who has control over wholesale sales. The statute does not say that state authority evaporates if the generation is sold at wholesale. New York is using its authority over generation to address a traditional area of state concern, environmental protection, and is using a core police power to do it, regulation of local utilities. Because the point of New York's program is to preserve the environmental benefits of carbon-free energy production, the payments are based on production, not on sales, just like the regional energy credit programs, which our friends on the other side think are just fine. Is there any distinction between production and sale in this particular context of nuclear power? There may be, Your Honor. In the plaintiff's complaint, they talk about the nuclear plants selling at wholesale either directly or indirectly. That's in paragraph 64 of their complaint. Directly into the auction or indirectly would be selling bilaterally. This court in the ALCO case has found that bilateral sales, which are subject to FERC regulation, are outside of use and don't fall into the use test. So there is a difference. Yes, but if that is so, then it's not selling indirectly into the auction. It's not selling into the auction. Correct. It's selling on the market. And there's nothing that prevents the nuclear plants from selling their power bilaterally. In fact, that was what the nuclear plants were doing for several decades during the time the markets were in place. Well, the bilateral contracts in ALCO, if I'm remembering correctly, were subject to FERC review for just and reasonableness. Yes, and so were these. Bilateral sales are subject to FERC review. Now, both this court and the FERC have found that states may create energy attribute payment streams that are production-based and are separate and apart from the revenues that you receive for the sale of the energy. What our friends on the other side are doing is they're saying there are two revenue streams, but they're only for one product. But that's wrong. That's a fallacy. What's actually going on is there are two revenue streams being received for two separate products. There's a revenue stream for the energy attribute, and there's a separate energy stream for the wholesale sale of the power. Conflating them, they conflate them and say, oh, look at that, it's all for wholesale energy. That's not the case. That's a fallacy. And it's the same way the REC program works. And FERC has said, has disclaimed jurisdiction over renewable energy credit. Yes. You say it's a fallacy, but does that mean it has to be proven or disproven? In other words, you can't decide on a motion to dismiss. No, no. The commission, the Federal Energy Regulatory Commission has already found in the WSPP case and the AMREF fuel case, which we cite, that states can create these environmental attribute programs. They are separate when they're sold in an unbundled way, which means in a separate transaction, which is exactly how these are sold. Regardless of the market realities, which is that all nuclear generators have to put their energy into the grid. Regardless of that reality. That that's how these programs, that if you have a generator, you have a REC generator, those generators will sell into the wholesale market as well. But if the energy attribute is separate and is based on production, FERC has disclaimed jurisdiction over those arrangements, Judge Chan. That's in the WSPP case. Also look at the AMREF fuel case where FERC is looking at the question. It's plainly a wholesale transaction. They're looking at the question of a sale by a qualifying facility under the purpose statute at wholesale and are trying to address the question, gee, what about the RECs? Do they convey as well? FERC says, no, those are not payments for energy or capacity. They're state-created payments for something else. Energy, environmental attributes. Environmental attributes and environmental benefits to the state. But the social cost of carbon is computed on the basis, is it not, of the costs worldwide? Is New York State privileged to basically have a foreign policy to say here are these worldwide costs and we're going to adjust, we are going to basically supplement, let's face it, supplement the wholesale price in order to achieve environmental effects not only outside New York State but outside the continent. Well, remember, on the question of the subsidy, subsidies are there to incent behavior that the market is not incenting, behavior that the state believes is appropriate here to address environmental protection. That's why we have a subsidy program. So our friend's first comment was the comment that you only get the subsidy if you can't make, if the other revenues you're receiving are inadequate. But that's just how a subsidy works. In the REC programs, it's a generic determination. The states want more renewable energy. The markets aren't providing sufficient incentives to do that, so we create a subsidy program to do it. The market meaning the wholesale rates set by FERC. Yes, it could mean that. It could mean any market. This is the one we're talking about today. That's the one we're talking about today. Yeah, absolutely. And by the way, back to another point that our friends made as well about the effect of the subsidy on wholesale prices. Remember that really there are two things going on here. There's the state program and there's the participation of these nuclear units in the wholesale market, and FERC controls the participation of the units in the market. So the price lowering effect that he's talking about is a consequence of the FERC regulatory scheme. So really this concern that they're raising really is a concern about how FERC runs their markets and really belongs at the FERC if it belongs anywhere. And as we noted in our brief, at footnote 36 of our brief, these plaintiffs have gone to FERC. They did over a year ago, filed a request for expedited action, and asked FERC to modify the market rules to address this problem. And FERC has declined to this point to take any action on that. The Seventh Circuit has a similar puzzle, and they've asked FERC to weigh in on it. The order doesn't say when they want to hear from FERC. Do we have any idea when that's going to be? I'm not in the Seventh Circuit case, nor obviously am I here on behalf of the United States, so I have no idea. I have no idea when that will happen. The other question, the other point my friend on the other side made was that for every unit you sell, I'm sorry, he addressed this in terms of the use case. Let me go back to that for a second. The use case is very specific. It was a one-ride ticket, I believe, and it's very clear from the Court's holding. Rarely do you see a Supreme Court holding that says not only that it's very limited, but also there's a fatal defect, and the defect is conditioning a subsidy on participation in a wholesale market. This doesn't do that. The state's regulation ends with the production. What happens after that is not addressed in the CES order because it wasn't the point. The point was to have the clean energy production. You might also note we mentioned in our papers the Northwest Central case, the Supreme Court case from a couple of years ago that deals with Kansas's regulation of the natural gas market. There, Kansas was regulating gas production, something that was plainly on the state's side of the line. But everyone knew it would have an impact on interstate wholesale sales purchases, and the Court said that did not make it preempted, that as long as the state was operating on its side of the line for a bona fide state purpose and was pursuing it in a means that was legitimately related, plausibly related to the purpose, then there would be no basis for preemption. What's the percentage increase in the rate payers' bill for this program? It depends. Everything depends. To be honest, Your Honor, I don't have that number. But what I do know, the reason I said it depends. Does this factor show up on the bill for the rate payers? It will show up. I believe it will show up on the bill. But remember, this is a retail product. So it hasn't started yet. No, it started roughly a year ago. So it's going to show up, but it started a year ago. So it does not show up on the bill. If you're telling me that because you're paying those bills. No, I don't pay my bills. My wife pays my bills. Mine too, Your Honor. The question I'm asking is you said they're going to show up. Oh, no. The program has been in effect for a year. That means that they don't show up. It will show up on the retail bill, Your Honor, yes. On the New York customer's retail bill, this will show up as a charge, yes, Your Honor. It will. No, I'm assuming it does as the program started a year ago. What is it marked as? I mean, this is my question. This is, in effect, is a hidden tax on the rate payers to pay for an environmental measure that the state deems worthwhile. But if your goal is to get to 50%, that burden on the rate payer is going to become enormous. And if it's a hidden tax, and, by the way, a highly regressive tax, then it seems to me there are problems here. Remember, the attempt to get to 50% by 2030, the nuclear plants will not count toward that. The reason we have this subsidy, this ZEC program, is because- No, I understand, but there's also the REC program. And that is going to, that's going to, that may show up as well. There is a cost associated with this program. The purpose of the nuclear part of it is so that while the renewable energy, you know where I'm going, Your Honor. You have a REC program and you have a ZEC program, and they're both designed to draw extra money out of rate payers to pass it along to favored producers, people who produce energy in a way that is favorable to the economy. I'm just, maybe it's irrelevant, but I'm kind of wondering whether the rate payer has any knowledge of this. Because if you get to 50%, it's going to be quite, it's going to be quite a series of subsidies. The state had a very extensive proceeding before adopting the REC and the ZEC program, and I'm confident that the rate payer advocates were there and very much aware of what was going on. Keep in mind that the REC program, which you mentioned, Your Honor, is actually not being challenged. The plaintiffs, our friends on the other side, have no issue with it. If I may, I know you're talking about- Please. which is that the rate payers will actually complain to their local politicians, but it's not necessarily a FERC issue because it has to do with rates to consumers. Oh, no, it's not a FERC issue at all. This is a retail product. It's priced by the retail commission. There's a process to challenge those determinations. Yes, Your Honor. Voters can deal with that, presumably. For sure. Thank you. Your Honor, may it please the Court, Matthew Price on behalf of Intervenor Appelese. I'd like, if I may, just to spend one minute providing a context for Hughes and then make three specific points about why the Court should reject plaintiffs' attempt to extend Hughes to this context. So states have been subsidizing power plants to promote environmental goals, taxing them, regulating them to promote environmental goals for decades. And the Federal Power Act allows that under the state's ability to regulate generation facilities. FERC has confirmed that, and we cite a number of cases in our brief, pages 5 through 7. The Supreme Court made clear that nothing in its opinion was intended to foreclose these types of subsidy programs, and the plaintiffs themselves concede that states can do carbon taxes and emissions caps and trades and presumably direct fixed subsidies as well. And the four features that Mischief really identified, three of them are true of any subsidy program. States don't subsidize to plants that don't need subsidies. The whole point of a subsidy is to provide extra money to a plant that needs it. And he says that New York guarantees that they receive not only auction sales but also ZEX. Well, that's true of any subsidy. Any subsidy is an extra revenue stream. And he also talks about how all these plants necessarily sell their output at wholesale. There's a dispute on that, which I'll get to, but assuming he's correct about that, again, that would be true of any subsidy in New York. The only distinguishing feature that makes this different is the pricing mechanism. And I think his case boils down to the notion that Hughes should be extended from a situation where there's an express requirement that you sell at wholesale in order to get the money to one where there's a pricing mechanism that's used. And I want to provide three reasons why the Court should reject that extension of Hughes. Now, the first is Mr. Verrilli has argued that our position is formalistic. Their position is also formalistic, and I think that's critical for the Court to understand. Under their theory, there should be no problem with a fixed subsidy amount, like the ZEX program actually is for the first two years. It's fixed at the social cost of carbon. But if New York had provided a fixed subsidy amount for the entire 12-year period from a functional standpoint, it would be worse from his perspective. His competitors would be getting more money. The wholesale prices would be more affected. It might be worse, but he's suggesting it might be legal. Well, but again, Your Honor, I mean, he can draw that distinction, but it's not one that's granted any value that the Federal Power Act is trying to protect that he asserts. It's a formalistic distinction between pricing mechanisms. Yeah, but when you concede that any subsidy is based on the insufficiency of the normal stream of income to sustain the enterprise or to provide a profit, then it seems to me you're conceding that what you have here is the retail supplier paying money to a producer to top off what the producer gets under the pricing mechanism that is FERC-regulated. Well, Your Honor— What am I missing? I mean, if you simplify this, there's so many complexities here, but basically it's what it is. The retail companies have to pay more money to the producer. Isn't that what a wholesale price is? No, Your Honor, because when FERC sets wholesale prices, it sets it basically indifferent to where the electrons come from. FERC isn't concerned. It's selling a commodity, electricity. States have the job under the Federal Power Act of caring about the environmental consequences of different methods of producing electricity. And for New York, it matters whether electricity is being produced by a coal or natural gas plant or instead by a nuclear plant or a renewable plant. And what the state is paying for is it's paying for the environmental benefits that that method of production provides New York that other plants don't provide. And renewables have been getting those subsidies for many years. Nuclear plants traditionally haven't because the state didn't see a need to bother. But that's no longer true, and now the state wants to provide nuclear plants with recognition of the environmental value that those plants provide to New York State. Not quite. As I read it, they're planning to provide the nuclear plants with what they need to stay alive until they can get rid of your clients altogether and substitute wind and solar and kitchen grease, whatever it is. Well, I think you're right that New York sees this as a transitional mechanism. That's right. That's correct. But the order, if you read it, is complete with findings by the commission about how if these plants were to retire now, you would take a giant step backwards in terms of New York's emissions profile. And what New York is concerned with is not having a massive backsliding in its emissions output. And that's its interest in preserving these plants until 2030. New York's, even its very valuable goals, that's not really what's at stake in the Hughes analysis, is it? It doesn't really matter why New York is doing it. It matters how New York is doing it. I agree with that, Your Honor. And what Hughes focused on is whether New York is or whether the state is conditioning payment on a wholesale sale. And that condition is what made the payment in Hughes a payment for wholesale electricity, because it was only made if you actually completed the wholesale sale. And if you look at page 1297, as well as footnote 9, it makes that very clear. That's why the Supreme Court thought this, the subsidy in that case, crossed the line into a- because the energy is going to go into the grid. There's no other place for it to go. So New York doesn't have to have the express condition that Maryland did. But in operation, it's exactly the same sort of program. Well, Your Honor, that argument gets to the second point I wanted to make, which is the accusation that our position is formalistic. And I think, admittedly, there may be a formalism in distinguishing between production and wholesale sale in some circumstances. But it's a formalism that Congress understood when it enacted the Federal Power Act, and that it embraced when it decided it knew. And we discussed this in the legislative history of this on pages 26 and 27 of our brief. Congress understood, when it enacted the Federal Power Act, that the production of electricity and its sale, interstate wholesale sale, were inextricably connected and instantaneous, that the moment electricity is produced, it needs to be sold. Yet Congress, nonetheless, decided to divide these two activities into separate sovereigns and give states the power to regulate generation facilities, which they've done for many years by taxing and regulating and subsidizing generation facilities, even those that sell exclusively at wholesale. And FERC recognized this important distinction as well in the WSPP case. There, FERC was presented with the question of, hey, we have a whole bunch of renewable generators that are all selling in the wholesale market. But they're getting these RECs from states. What do we do with those? And FERC said, well, you're all selling in the wholesale market, but those RECs reflect a different product. They reflect the environmental attribute, and so long as they're not bundled together with the energy sale so it's all one sale, we're going to treat them as outside our jurisdiction. So FERC understood these spheres are intertwined, but nonetheless, they're distinct, and Congress made the decision to divide them between separate sovereigns, despite the fact that maybe there's some formalistic element to that. Now, the third point I wanted to make is that this court has already decided this case twice. The first time was in the ALCO case, and there the court dealt with a Connecticut procurement for wholesale energy. So this is at the core of FERC's jurisdiction. And Connecticut set up a procurement process, and it said we're going to pick the winner of this procurement process and direct the utility to go buy wholesale energy from this generator. And this court said that's not preempted, and the reason it's not preempted is because the state isn't actually compelling. It is not actually compelling the utility to buy the power from the generator. It's expected. It's intended. That's the whole purpose of the program, but it's not compelled. And so this court said there's no preemption issue. The state hasn't intruded into the wholesale domain. Now, this case is easier than that case because this case doesn't even involve wholesale energy. It involves the purchase of environmental attributes, which, as I've said, FERC recognizes, and this court in the wheelbraider case has recognized it as a distinct product under state jurisdiction. Now, the second case is the Rochester gas and electric case. In that case, this court held that there is a difference between accounting for wholesale price forecasts and actually regulating wholesale prices. The two are different things. And in that case, the New York Commission said the utility is selling a bunch of electricity at wholesale and getting wholesale revenues, but we want to make sure that it recovers its costs and we're going to recover the difference from retail rate payers and retail rates. So the state set its retail rates knowing and anticipating a certain amount of wholesale revenue and adjusted those retail rates accordingly. And this court said there's no preemption there because, again, recognizing revenue is different than actually regulating the wholesale rate.  because here the price is fixed for the first two years. Afterwards, it doesn't depend on any generator's actual wholesale revenues. It's set an advance base on price forecasts that FERC does not regulate, and we cite the Hunter case on that issue. FERC does not regulate them for a different region of New York than the generators are located. So this case is easier than Rochester. There's one more point I want to make about the fact question. Judge Jacobs, you asked, and I believe Judge Chen as well, isn't there a fact question about what LIPA does or doesn't do? There may be a factual dispute about that, but it's not one that needs to be resolved in order to affirm the district court. And the reason for that is requiring the state to basically engage in discovery against a third party in order to determine whether its program does or doesn't cross the line into a forbidden federal sphere is a completely unworkable approach to preemption. It is enough if the state is indifferent to where the recipients of its subsidies sell their power. Here the state is indifferent. It doesn't care at all what LIPA does, how it organizes its business, how the New York ISO organizes the grid. It simply says if you produce power, we will give you a ZEC because we value the environmental benefits of that production. Thank you. Thank you. We'll hear rebuttal. Thank you. Starting with FERC's views, Your Honor, I can't give you a time estimate for when they're going to file their brief in the Seventh Circuit, but given the centrality to my friends on the other side of what they claim FERC thinks, perhaps it would be prudent to see what FERC actually says about this. And in that regard... But it would be tempting to ask FERC to send us a position statement or a brief. Can we assume that what they say in the Seventh Circuit will be the same as what they would have said here? I would assume so, Your Honor. That's what I'm assuming. But specifically, just to clear something up about what my friends on the other side say is FERC's views, I think if you look at that WSPP decision, first, they say it's limited to the facts before it. It wasn't some grand pronouncement on the issue before you. But second... I think you said that too. Yes. In that WSPP decision, what FERC said was that some of the RECs were subject to FERC's jurisdiction and some weren't, and it depended on how close the link was to the wholesale sales. So what that tells you is you've got to figure out how close the link is. It doesn't answer the question, it just poses it. But there's no doubt that there are some subsidies that consist of basically a levy on retail distributors to be paid to producers, and that affects, by addition, by arithmetic, the wholesale price, doesn't it? And that seems to be quite tolerated. Well, I think, you know, going back to what the Supreme Court said in Hughes, it all depends on the regulatory means the state chooses. Some means directly interfere with FERC's processes and some don't. And I do think it's critical, I'm just going to jump to a point that my friend Mr. Price made about the Congress understanding that the states have sovereignty and authority over generation and production and the federal government over wholesale sales. That's precisely the argument that the state of Maryland made in those words in Hughes. We're just trying to get more generation online. That's why we set up the program we set up. That's why the Supreme Court in Hughes said what matters is not your aim, however worthy, but the means you choose. So I just think that takes that off the table. Now, I do think ALCO is important. Your Honor's raised the question of ALCO. Some critical things about that, that ALCO provided for the possibility of bilateral wholesale contracts, but the state was not prescribing the price. There was no subsidy involved in those at all. And in ALCO, it was just an opportunity for wholesale transactions to occur under that program, and then they would be at whatever price the parties agreed to. The state wasn't prescribing the price. What my friends are saying here is that with respect, not only with respect to the auctions, but with respect to whatever they sell under contract at wholesale, you get the wholesale price that you negotiate, and then you get the ZEC subsidy on top of it, and the ZEC subsidy is outside FERC's jurisdiction. So you can submit the contract to FERC for review as to whether the contract price is just and reasonable, but you can't subject the fact that they also get the ZEC payment on top of it to FERC's review, and that's exactly the position Exelon has taken before FERC. So the idea that ALCO answers this case is completely wrong. It has nothing to do with it, and it doesn't have any of the characteristics that I described in my opening that are present here. Now, with respect to this point about the auctions, you know, of course, FERC hasn't just chosen the auctions as some random way of setting wholesale rights. They've chosen it because they want to rely on market mechanisms to send the proper signals to the participants in the market. And what happens when you... And this really was at the root of the problem in Hughes, and it's the root of the problem here. When you guarantee wholesale producers that they're going to get a per-megawatt-hour subsidy on top of those just and reasonable rates, you're interfering in the most direct way possible with that mechanism. Sure, Your Honor's right that there are going to be incidental economic effects from other things that the states can do because that's in the nature of the fact that we have a dual system. But when you intervene in this direct way, you're doing exactly what Hughes said we can't do. And I think it's important, if I may just take one minute, to draw an analogy to a case that the Supreme Court decided that we've cited in our briefs, the National Meat case, a preemption case about regulating slaughterhouses. The federal government regulates slaughterhouses, says nonambulatory animals can be slaughtered under some circumstances in a slaughterhouse. California comes along and it doesn't like that. And it says, okay, we can't regulate the slaughterhouse practice because the federal government regulates that, but what we're going to do is enact a law in our sphere that says you can't sell any meat that comes from a nonambulatory animal. The Supreme Court had no trouble unanimously preempting that, even though the argument's exactly the same as the argument my friends on the other side are making here. Oh, no, this is about production. It's not about wholesale sales. National Meat, same thing. Thank you. Thank you all. We will reserve decision.